THE WESTERN UNION TELEGRAPH COMPANY V. JESSE
C. CRALL.

1. MISTAKES — *Immunity from Liability* — *Void Contract.* A telegraph company cannot, by special contract, stipulate for immunity from liability for errors and mistakes in transmitting and delivering messages, when the errors and mistakes result from its own gross negligence. Such a stipulation, being against public policy, would be void.

2. ERRORS — *Gross Negligence* — *Burden of Proof.* Where, in an action against the company for damages resulting from an inaccurate transmission of a short message, it appears from the comparison of the message delivered with the one sent, there were two mistakes, besides an error in the name of the sender, the burden of proof is on the company to show that the mistakes were not the result of its own gross negligence.

*Error from Atchison District Court.*

ACTION by *Crall* against the *Telegraph Company,* to recover damages claimed by reason of the negligence of the defendant in the transmission of a certain message sent from Atchison to Eureka, Kansas, on September 19, 1883. Trial by the court at the February Term, 1886, and judgment for the plaintiff for $136.10. The defendant company brings the case here. The material facts are stated in the opinion.

*Waggener, Martin & Orr,* for plaintiff in error.

*Tomlinson & Eaton,* for defendant in error.

Opinion by HOLT, C.: On September 19, 1883, Jesse C. Crall, the defendant in error, by his son and agent Graham Crall, delivered to the defendant company, at Atchison, Kansas, the following message, leaving out printed matter, etc.:

"*To J. B. Smith, Esq., Eureka, Kansas:* Ship Bones, sulky and trap to Valley Falls immediately.

GRAHAM CRALL."

The message received by Smith on the same day, at Eureka, omitting printed matter, etc., was as follows:

"*To J. B. Smith:* Ship Beons, sulky and traps to Neosha Falls immediately. GRAHAM CROLT."

"Bones" was the name of a trotting horse owned by Crall, and at that time in charge of Smith at Eureka. He immediately shipped the horse, sulky and traps to Neosho Falls, where they remained several weeks before Crall ascertained where they were. Smith, being only temporarily in charge of the horse, left Eureka, and Crall had no communication from him, nor did he know his whereabouts, until after the horse was found at Neosho Falls, although he made diligent inquiry for him. Trial was had at the February term, 1886, in the Atchison district court, and a jury being waived, the court specially found that the message in the dispatch was very plainly written, in a large, round hand, so that no word in it could have been mistaken for any other word, if examined even with the slightest care; that the weather was fair and pleasant on and during all of the day on which the said dispatch was sent, both at Atchison and Eureka, and that there was no evidence of any electrical disturbance at any place on the line between said points. The seventh finding of fact is as follows:

"There is no similarity in the telegraphic symbols or characters, nor in the sound made by the instrument in forming said symbols or characters, between the words 'Valley' and 'Neosho;' and there being no electrical disturbance, the three mistakes in the transmission of said message were the result of the gross negligence of the defendant's operators, or the gross negligence of the defendant in keeping instruments and appliances that were out of order and not in proper condition for use."

Crall brought his action against the telegraph company for the expense of keeping the horse, loss of its use, etc.; judgment was rendered for the plaintiff for $136.10, and costs. The defendant company brings the case here for review. For a defense, the defendant relied upon the contract printed above the message sent by Graham Crall. It is as follows:

"THE WESTERN UNION TELEGRAPH COMPANY.

"All messages by this company are subject to the following terms:

"To guard against mistakes or delays, the sender of a mes-

sage should order it repeated; that is, telegraphed back to the originating office for comparison.    For this, one-half the regular rate is charged in addition.    It is agreed between the sender of the following message and this company, that said company shall not be liable for mistakes or delays in the transmission or delivery, or for non-delivery, of any unrepeated message, whether happening by negligence of its servants or otherwise, beyond the amount received for sending the same; nor for mistakes or delays in the transmission or delivery, or for non-delivery, of any repeated message, beyond fifty times the sum received for sending the same, unless specially insured; nor in any case for delays arising from unavoidable interruption in the working of its lines, or for errors in cipher or obscure messages.    And this company is hereby made the agent of the sender, without liability, to forward any message over the lines of any other company when necessary to reach its destination.

"Correctness in the transmission of a message to any point on the lines of this company can be insured by contract in writing, stating agreed amount of risk, and payment of premium thereon, at the following rates, in addition to the usual charge for repeated messages, viz.: One per cent. for any distance not exceeding 1,000 miles, and two per cent. for any greater distance.    No employé of the company is authorized to vary the foregoing.

"No responsibility regarding messages attaches to this company until the same are presented and accepted at one of its transmitting offices; and if a message is sent to such office by one of the company's messengers, he acts for that purpose as the agent of the sender.

"Messages will be delivered free within the established free delivery limits of the terminal office.    For delivery at a greater distance, a special charge will be made to cover the cost of such delivery.

"The company will not be liable for damages in any case where the claim is not presented in writing, within sixty days after sending the message."

Immediately above the dispatch, in print, was:

"Send the following message, subject to the above terms, which are hereby agreed to."

The defense the telegraph company interposed will require an examination of the legal effect of this contract, to determine the liability, if any, of the defendant to the plaintiff.

In the first place it is well enough to consider the circumstances under which such contracts are usually made.    The demand for haste and dispatch upon which the business of telegraphy is based virtually compels the sender of a message to accept the terms offered ; often he has no choice in the selection of the company to do the work required, and then a single message is of comparatively little interest to the company — simply the remuneration for sending it — while it may be of great importance to the sender.    He would probably have his right of action against the company to compel it to make a reasonable contract with him, for to a certain extent telegraph companies are *quasi* public servants, and owe the public certain duties, as they can exercise the right of eminent domain, and receive franchises.    But he does not wish to be forced to compel it to make a fair and reasonable contract; his object is to have his message sent promptly, and he would therefore accept hard conditions at the hands of the company, rather than delay his business and seek redress in the courts. Under such circumstances the parties are not dealing on an equal footing.    When the company has such an advantage, in consequence of the nature of its employment, it can easily dictate terms.    It should not, however, be sustained in treating its patrons unfairly and inequitably, and supported in unconscionable contracts made under such circumstances. (*Telegraph Co. v. Graham*, 1 Col. 230; *Tyler v. Telegraph Co.*, 60 Ill. 421; Gray on Communication by Telegraph, § 48.)

Was the contract itself a valid one ?    It is not claimed by the defendant in error that the telegraph company is an insurer of a message sent, nor that it cannot make reasonable regulations for carrying on its own business, but it is urged that a telegraph company cannot by contract exempt itself from all ability that may arise by reason of its own negligence in failing to provide suitable instruments, or from negligence of its operators and servants.    He cites a long list of authorities that apparently support this contention.    However, in disposing of this matter it is not necessary to pass upon the question urged, for in this case it is found by the court that the de-

fendant company was guilty of gross negligence. The provision in the contract that the company will not be held liable for unrepeated messages, happening by negligence of its servants, beyond the amount received for the sending of the same, is not valid to relieve it from liability against its own gross negligence. It is the duty of the telegraph company, when it receives a message and the money therefor, from the sender, to exercise care and diligence in transmitting it promptly and accurately. No contract should be sustained by the courts which would excuse it from gross negligence or willful misconduct in performing a service undertaken for another for hire. The current of authorities to sustain this principle is unbroken. The interests are many and varied, depending upon the proper performance by it of the work it assumes; and it is against public policy that it should be allowed to stipulate for exemption from the exercise of care and diligence in this duty, which it has voluntarily taken upon itself. This rule does not make the telegraph company an insurer, but it does prevent it from evading its liabilities for its errors arising from gross negligence. (*Telegraph Co. v. Griswold*, 37 Ohio St. 301; *Telegraph Co. v. Tyler*, 74 Ill. 168; *Sweatland v. Telegraph Co.*, 27 Iowa, 433; *Bartlett v. Telegraph Co.*, 62 Me. 209; *Telegraph Co. v. Graham*, 1 Col. 230; *Candee v. Telegraph Co.*, 34 Wis. 471; *Ellis v. Telegraph Co.*, 95 Mass. 226; *Ayers v. Telegraph Co.*, 79 Me. 495; same case, 10 Atl. Rep. 495.)

1. Contract against public policy.

Was the telegraph company guilty of gross negligence? It is so found by the court below, and we think the findings are abundantly supported by the evidence in the case. In a message containing nine words besides the address and signature of the sender, there were three mistakes; it was sent over defendant's own line, on a fair day in which there were no electrical or atmospherical disturbances; and the court especially found that there was no similarity in the sounds, symbols and characters used in telegraphy for the words "Valley" and "Neosho." There is no good reason, in the absence of atmos-

pherical or electrical disturbances, why the message should not have been transmitted exactly as it was received. The art of telegraphy has been reduced to comparative exactness and certainty, and it was only by the gross carelessness of the operator, or the culpable imperfections of the instruments and appliances of the company, that such a mistake could have been made in transmitting the message so short a distance upon a calm, fair day.

There is no testimony introduced in this case by the defendant company, and we presume the mere production of the mutilated message would have been sufficient to establish the gross carelessness of the defendant. It would have thrown the burden of proof upon the defendant, to excuse or explain its mistakes. (*Griswold v. Telegraph Co.*, 37 Ohio St. 301; *Rittenhouse v. Telegraph Co.*, 44 N. Y. 263; *Baldwin v. Telegraph Co.*, 45 id. 44; *Telegraph Co. v. Carew*, 15 Mich. 525; *Telegraph Co. v. Meek*, 49 Ind. 53; *Turner v. Telegraph Co.*, 41 Iowa, 458.) The plaintiff did prove in addition, that the weather was favorable for the use of defendant's wires and instruments.

2. Mistakes; explanations; burden of proof.

We believe that the findings of the court are sustained by ample testimony showing gross negligence on the part of the company, and that the contract urged as a defense by the defendant is of no legal force whatever, when it is attempted thereby to relieve the company of its gross negligence.

We recommend that the judgment be affirmed.

By the Court: It is so ordered.

All the Justices concurring.