[No. 14935.  *En Banc.*  November 12, 1919.]

RASHER-KINGMAN-HERRIN COMPANY, *Respondent,* v.
POSTAL TELEGRAPH-CABLE COMPANY, *Appellant.*[1]

COMMERCE (1)—REGULATION — POWERS OF STATE — EXCLUSION BY
FEDERAL CONTROL—TELEGRAPH COMPANIES.  Congress, by 36 U. S. St.
at Large, p. 539 (U. S. Comp. St. 1913, §§ 8581, 8583), making tele-
graph companies common carriers and applying the interstate com-
merce act to them, has occupied the entire field and taken complete
control of telegraph companies to the exclusion of state laws, which
are superseded.

TELEGRAPH AND TELEPHONES (9)—MESSAGES—LIABILITY FOR MIS-
TAKES.  Under U. S. Comp. St. 1913, §§ 8581, 8583, authorizing tele-
graph companies to classify messages into repeated and unrepeated
messages and to charge different rates for the same, a company
would not be liable for a mistake in an unrepeated message, stipu-
lated on the back of the telegraph blank to have been sent without
liability for mistake, if the charges were just and reasonable, re-
gardless of state laws.

COURTS (38)—RULE OF DECISION—FEDERAL QUESTIONS.  The con-
struction of the interstate commerce act as it relates to telegraph
companies is primarily a Federal question, upon which the de-
cisions of the United States supreme court are controlling.

HOLCOMB, C. J., and TOLMAN, J., dissent.

Appeal from a judgment of the superior court for
Spokane county, Huneke, J., entered March 4, 1918,
upon findings in favor of the plaintiff, in an action for
damages, tried to the court.  Reversed.

*Horace Kimball, W. C. Donovan,* and *George H.
Armitage,* for appellant.

*Burcham & Blair,* for respondent.

*Grinstead & Laube, amicus curiae.*

MAIN, J.—The purpose of this action was to recover
damages which resulted from a mistake in the trans-
mission of an unrepeated night lettergram.  The cause
was tried to the court without a jury, and resulted in

[1]Reported in 185 Pac. 947, 1119.

findings of fact, conclusions of law and a judgment sustaining the plaintiff's right to recover in the sum of six hundred dollars. From this judgment, the defendant appeals.

As the case is controlled by a question of law, the facts will only be briefly stated. The respondent, Rasher-Kingman-Herrin Company, a corporation, was engaged in business in the city of Spokane, this state. One A. W. Taylor was engaged in business at Calgary, Canada. The appellant, the Postal Telegraph-Cable Company, is a corporation engaged in the transmission of telegraphic messages for hire. The respondent, answering an inquiry from Taylor, delivered to the appellant a message which quoted "lemons seven dollars." When this message was delivered to Taylor at Calgary it read, "lemons four dollars." Taylor accepted the offer as stated in the telegram delivered to him, and the lemons, together with other articles, were shipped. When they arrived at Calgary, Taylor refused to take the lemons at a price other than four dollars. The action is to recover the difference between the seven dollars quoted on the lemons in the message delivered at the Spokane office and the four dollars specified in the message when delivered to Taylor at Calgary. In transmitting the message it was first sent to Seattle, and from that office relayed to Vancouver, British Columbia, where it was again relayed to the point of destination. There is some controversy as to whether the error in the transmission was that of the operator at Seattle in placing it on the line or that of the operator at Vancouver, who received it for retransmission. It will be assumed that the error was that of the operator in Seattle in relaying the message from there. The message at Spokane was written upon one of the appellant's blanks which

it supplied for that purpose. On the face of this blank appeared the following:

"Send the following night lettergram, without repeating, subject to the terms and conditions printed on the back hereof, which are hereby agreed to."

One of the conditions written on the back thereof was:

"The Company [the appellant] shall not be liable for mistakes or delays in the transmission or delivery, or for non-delivery, of any unrepeated night lettergram, beyond the amount received for sending the same; . . ."

It is not claimed that the sender of the message did not know of the terms and conditions referred to.

The controlling question is whether Congress, by legislation, has occupied the field covering the transmission of interstate messages and messages to foreign countries. If it has by such legislation so occupied the field, the judgment of the trial court cannot be sustained. The decisive question, therefore, is whether, under the interstate commerce law (24 Stat. 379), as amended by act of Congress of June 18, 1910, c. 309, 36 U. S. Statutes at Large, page 539, state laws regulating the contract obligations and liabilities of common carriers in interstate telegrams, or telegrams to foreign countries, have been superseded and annulled by the provisions of the Federal law. Section 1 of the amended act contains the following:

"The provisions of this act shall apply .. . . to telegraph, telephone, and cable companies (whether wire or wireless) engaged in sending messages from one State, Territory, or District of the United States, to any other State, Territory, or District of the United States, or to any foreign country, who shall be considered and held to be common carriers within the meaning and purpose of this act. . . . All charges

made for any service rendered. or to be rendered in the transportation of passengers or property and for the transmission of messages by telegraph, telephone, or cable, as aforesaid, or in connection therewith, shall be just and reasonable; and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful: Provided, that messages by telegraph, telephone, or cable, subject to the provisions of this act, may be classified into *day, night, repeated, unrepeated, letter, commercial press, government, and such other classes as are just and reasonable, and different rates may be charged for the different classes of messages. . . .*" [Italics supplied.]   U. S. Comp St., § 8563.

The act, as amended (Compiled Statutes, 1913, §§ 8581, 8583), gives to the interstate commerce commission power to determine what rates, regulations or practices are just and reasonable. Under the act an interstate carrier has a right to make regulations such as are just and reasonable governing the conduct of such interstate business. In the excerpt quoted above from the amendment referred to, telegraph companies engaged in sending messages from one state to another, or to any foreign country, are made common carriers, and the interstate commerce act is made to apply thereto. It is expressly provided, that the charges for the transmission of such messages shall be just and reasonable; that messages may be classified into day, night, repeated, unrepeated, and the other classes mentioned; and that different rates may be charged for the different classes of messages.

The question here for decision has been many times before the courts of other jurisdictions, but it is one of first impression in this court. Two of the Federal courts—one district and the other the circuit court of appeals for the eighth circuit—the interstate commerce commission, and the courts of Alabama, Georgia,

Kansas, Maine, Minnesota, Missouri, North Carolina, Oklahoma, South Carolina, Tennessee, Virginia, and Wisconsin have held that, by the act of Congress approved June 18, 1910, telegraph companies, as to their interstate and foreign business, have been placed under the supervision of the interstate commerce commission, and that the act has occupied the entire field and taken complete control of the regulation of telegraph companies to the exclusion of state laws. *Williams v. Western Union Tel. Co.*, 203 Fed. 140; *Gardner v. Western Union Tel. Co.*, 231 Fed. 405; *Unrepeated Message Case*, 44 I. C. C. 670; *Boyce v. Western Union Tel. Co.*, 119 Va. 14, 89 S. E. 106; *Bailey v. Western Union Tel. Co.*, 97 Kan. 619, 156 Pac. 716; *Western Union Tel. Co. v. Bank of Spencer*, 53 Okl. 398, 156 Pac. 1175; *Western Union Tel. Co. v. Schade*, 137 Tenn. 214, 192 S. W. 924; *Western Union Tel. Co. v. Hawkins*, 198 Ala. 682, 73 South. 973; *Hall v. Western Union Tel. Co.*, 108 S. C. 502, 94 S. E. 870; *Western Union Tel. Co. v. Petteway*, 21 Ga. App. 725, 94 S. E. 1032; *O'Neill & Gyles v. Postal Telegraph-Cable Co.*, 201 Ill. App. 37; *Haskell Implement & Seed Co. v. Postal Telegraph-Cable Co.*, 114 Me. 277, 96 Atl. 219; *Dettis v. Western Union Tel. Co.*, 141 Minn. 361, 170 N. W. 334; *Poor Grain Co. v. Western Union Tel. Co.*, 196 Mo. App. 557, 196 S. W. 28; *Meadows v. Postal Tel. & Cable Co.*, 173 N. C. 240, 91 S. E. 1009; *Durre v. Western Union Tel. Co.*, 165 Wis. 190, 161 N. W. 755.

The courts of the states of Texas, Mississippi, Arkansas, and Indiana have taken the opposite view. *Western Union Tel. Co. v. Bailey*, 108 Tex. 427, 196 S. W. 516; *Dickerson v. Western Union Tel. Co.*, 114 Miss. 115, 74 South. 779; *Western Union Tel. Co. v. Boegli* (Ind.), 115 N. E. 773; *Des Arc Oil Mill v. Western Union Tel. Co.*, 132 Ark. 335, 201 S. W. 273.

The courts last mentioned hold that the amendatory act above referred to relates to rates and the classification of messages, and does not cover the subject of liability for negligence. Under those cases the same liability would exist if mistakes were made in transmission of an unrepeated as in a repeated message. The courts sustaining the view that the act has occupied the field, point out that, if the same liability exists for a mistake in the transmission of an unrepeated as in a repeated message, the right to classify and to make different charges for the respective classes would be of little consequence. The supreme court of Massachusetts, in *Western Union Tel. Co. v. Foster*, 224 Mass. 365, 113 N. E. 192, expressed the opinion that, so far as the act manifests a purpose to regulate the field over which Congress has paramount authority, the right of the state to exercise its police power in the same field ceases to exist, "no matter whether the particular act of Congress covers it entirely or not."

The appellant's regulation was specified upon the telegraph blank used, to the effect that there should be no liability for mistakes in the transmission of an unrepeated message. Under the act of Congress it had the power to classify messages into repeated and unrepeated, and to make different charges for the same. To sustain a recovery in this case would be equivalent to holding that the regulations of the company made under the act of Congress and its classification of its messages under the act were not effective. The jurisdiction to determine these matters is not in the state courts. It is said, however, that the act of Congress does not fix a rule of liability, and that therefore the state rule should be applied. If the appellant's rules and regulations with reference to the transmission of unrepeated messages and the charges therefor are just and reasonable, no liability would

exist; hence there would be no occasion for the application of the state law. The question is one which has been so frequently before the courts and so fully discussed that extended discussion here would add nothing to what has already been said. We are of the opinion that not only the great weight of authority but the better reason is with the decisions holding that the act of Congress mentioned has occupied the field, and that state laws, whatever they may be, defining the rule of liability for negligence, cannot be applied.

The judgment will be reversed.

MACKINTOSH, FULLERTON, PARKER, MITCHELL, and MOUNT, JJ., concur.

TOLMAN, J. (dissenting)—The majority opinion is silent upon the question of whether or not appellant, by its stipulation to that effect upon the back of the form used for sending the message, can escape all liability for negligence for its mistakes, delay in transmission or delivery, or nondelivery of an unrepeated message; but the great weight of authority is to the effect that liability cannot be so avoided. A reasonable limitation of the liability, if contracted for, might be upheld, but a stipulation against all liability (and this is such a stipulation, because to return the unearned fee for sending a correct message is not a payment of any damages sustained) is against public policy and void. Among the authorities which so hold are the following: *Strong v. Western Union Tel. Co.,* 18 Idaho 389, 109 Pac. 910, Ann. Cas. 1912A 55, 30 L. R. A. (N. S.) 409; *Western Union Tel. Co. v. Anniston Cordage Co.,* 6 Ala. App. 351, 59 South. 757; *Stiles v. Western Union Tel. Co.,* 2 Ariz. 308, 15 Pac. 712; *Western Union Tel. Co. v. Short,* 53 Ark. 434, 14 S. W. 649, 9 L. R. A. 744; *Western Union Tel. Co. v. Tyler,* 74 Ill. 168, 24 Am. Rep. 279; *Central Union Tel. Co. v.*

*Swoveland,* 14 Ind. App. 341, 42 N. E. 1035; *Harkness v. Western Union Tel. Co.,* 73 Iowa 190, 34 N. W. 811, 5 Am. St. 672; *Western Union Tel. Co. v. Crall,* 38 Kan. 679, 17 Pac. 309, 5 Am. St. 795; *Reed v. Western Union Tel. Co.,* 135 Mo. 661, 37 S. W. 904, 58 Am. St. 609, 34 L. R. A. 492; *Western Union Tel. Co. v. Lowrey,* 32 Neb. 732, 49 N. W. 707; *Blackwell Milling & Elevator Co. v. Western Union Tel. Co.,* 17 Okl. 376, 89 Pac. 235.

This brings us, then, to what the majority denominates the controlling question in the case, that is: "whether Congress, by legislation, has occupied the field covering the transmission of interstate messages and messages to foreign countries." It may be admitted that the courts are divided upon this question; but feeling, as I do, that the states should maintain their jurisdiction until it appears beyond doubt that Congress has occupied the field, I cannot concur with the majority, nor do I think that the better reasoning is with the majority—quite the contrary. The 1910 amendment, upon the construction of which rests the solution of the question, has never been specifically passed upon by the supreme court of the United States, and yet the decisions of that court clearly indicate that this amendment does not take away from the several states the right to apply their own rules of liability in cases of negligence.

This amendment adds nothing to the original interstate commerce act to show a purpose or intent on the part of Congress to occupy the field exclusively, and its purpose seems to be to include under the operation of the act telegraph and telephone companies not theretofore included, upon practically the same terms as those which affected railroads and other common carriers prior to the amendment of 1906, commonly called the Carmack amendment, and nowhere in the language employed is there anything of the character

of the Carmack amendment which in terms applies only to carriers of goods and does not apply to telegraph companies. In discussing the interstate commerce law and the effect of the Carmack amendment, the supreme court of the United States said, in *Adams Express Co. v. Croninger,* 226 U. S. 491, 44 L. R. A. (N. S.) 257:

"That the constitutional power of Congress to regulate commerce among the States and with foreign nations comprehends power to regulate contracts between the shipper and the carrier of an interstate shipment by defining the liability of the carrier for loss, delay, injury or damage to such property, needs neither argument nor citation of authority.

"But it is equally well settled that, until Congress has legislated upon the subject, the liability of such a carrier, exercising its calling within a particular State, although engaged in the business of interstate commerce, for loss or damage to such property, may be regulated by the law of the State. Such regulations would fall within that large class of regulations which it is competent for a State to make in the absence of legislation by Congress, growing out of the territorial jurisdiction of the State over such carriers and its duty and power to safeguard the general public against acts of misfeasance and nonfeasance committed within its limits, although interstate commerce may be indirectly affected: *Smith v. Alabama,* 124 U. S. 465; *New York &c. Railroad v. New York,* 165 U. S. 628; *Chicago, Milwaukee & St. P. Ry. v. Solan,* 169 U. S. 133, 137; *Richmond &c. Ry. v. Patterson Co.,* 169 U. S. 311; *Cleveland &c. Ry. v. Illinois,* 177 U. S. 514; *Pennsylvania Railroad v. Hughes,* 191 U. S. 477. In the *Solan* case, cited above, it was said of such state legislation:

" 'They are not, in themselves, regulations of interstate commerce, although they control, in some degree, the conduct and the liability of those engaged in such commerce. So long as Congress has not legislated upon the particular subject, they are rather to be regarded as legislation in aid of such commerce, and as

a rightful exercise of the police power of the State to regulate the relative rights and duties of all persons and corporations within its limits.' "

After discussing the effect of these decisions, made prior to the Carmack amendment, the court again says:

"In view of the decisions of this court in the two cases last referred to, we shall assume that this case is governed by them, unless the subsequent legislation of Congress is such as to indicate a purpose to bring contracts for interstate shipments under one uniform rule of law not subject to the varying policies and legislation of particular States. . . .

"That the legislation supersedes all the regulations and policies of a particular State upon the same subject results from its general character. It embraces the subject of the liability of the carrier under a bill of lading which he must issue and limits his power to exempt himself by rule, regulation or contract. Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all state regulation with reference to it. Only the silence of Congress authorized the exercise of the police power of the State upon the subject of such contracts. But when Congress acted in such a way as to manifest a purpose to exercise its conceded authority, the regulating power of the State ceased to exist. *Northern Pacific Ry. v. State of Washington,* 222 U. S. 370; *Southern Railway v. Reid,* 222 U. S. 424; *Mondou v. Railroad,* 223 U. S. 1.''

A reading of the 1910 amendment, quoted in the majority opinion, at once discloses that Congress has there covered the subject of rates and charges only, and by no word or set of words has it attempted to legislate upon the subjects of negligence in the transmission or delay of messages, or liability for such negligence. For the position of the supreme court of the United States upon the particular question here involved, we are therefore brought back to the cases of

*Pennsylvania R. Co. v. Hughes,* 191 U. S. 477, and *Chicago, Milwaukee & St. Paul R. Co. v. Solan,* 169 U. S. 133, based upon the law as it was prior to the Carmack amendment and as the law now is with reference to telegraph and telephone companies, in the former of which it is said:

"In refusing to limit the recovery to the valuation agreed upon, did the state court deny to the company a right or privilege secured by the interstate commerce law? It may be assumed that under the broad power conferred upon Congress over interstate commerce as defined in repeated decisions of this court, it would be lawful for that body to make provision as to contracts for interstate carriage, permitting the carrier to limit its liability to a particular sum in consideration of lower freight rates for transportation. But upon examination of the terms of the law relied upon we fail to find any such provision therein. . . .

"While under these provisions it may be said that Congress has made it obligatory to provide proper facilities for interstate carriage of freight, and has prevented carriers from obstructing continuous shipments on interstate lines, we look in vain for any regulation of the matter here in controversy. There is no sanction of agreements of this character limiting liability to stipulated valuations, and, until Congress shall legislate upon it, is there any valid objection to the State enforcing its own regulations upon the subject, although it may to this extent indirectly affect interstate commerce contracts of carriage? . . .

"The State has a right to promote the welfare and safety of those within its jurisdiction by requiring common carriers to be responsible to the full measure of the loss resulting from their negligence, a contract to the contrary notwithstanding. This requirement in the case just cited is held not to be an unlawful attempt to regulate interstate commerce in the absence of Congressional action providing a different measure of liability when contracts, such as the one now before us, are made in relation to interstate carriage."

The decisions which hold that the right to classify messages and make different rates for the different classes, which is clearly given by the amendment under discussion, includes also the right to make rules limiting or excluding liability for negligence in the transmission or delay, seem to read something into the act which I am unable to find there, which, under any fair construction of the language used, was not intended by the law-making power. In *Western Union Tel. Co. v. Piper* (Tex. Civ. App.), 191 S. W. 817, it is said:

"In view of what has thus been stated, it can hardly be said to be clear that Congress, by the enactment of the act of 1910, intended to subject telegraph companies to the operation of the wholly inapplicable regulations originally designed for the government of an altogether different character of carrier. The law of 1910, as will be seen by a reference to it, as hereinbefore quoted, and in so far as herein pertinent, merely impresses upon telegraph companies the character of a common carrier; provides that their charges shall be 'just and reasonable'; declares that unjust and unreasonable charges shall be unlawful; and specially provides that messages may be classified as in the act directed, and that 'different rates may be charged for the different classes of messages.' No reference whatever is made to the subject of the contract for the transmission of the message or of the liability for the breach of such contract. Had Congress intended to assume control over these subjects it would seem to have been easy to have so declared, or to have provided appropriate regulations having such effect, as was done in the case of carriers of property. As Mr. Justice Hodges in the opinion in the *Bailey Case,* as printed in the 171 S. W. 842, so pertinently and forcefully says, after reviewing the act of 1910:

"'It appears from these extracts that the extent to which Congress has gone is merely to declare that telegraph companies shall be considered common carriers, and to require them to make and observe reasonable rates and charges for the services which they per-

form, and to permit them to divide their messages into classes, presumably as a basis for rates. The mere fact that Congress has enacted some legislation on this subject does not, of itself, signify a purpose to monopolize the field and exclude the states entirely. *M. K. & T. Ry. Co. v. Harris,* 234 U. S. 412, 34 Sup. St. 790, 58 L. Ed. 1377, L. R. A. 1915E 942; *Atl. C. L. Ry. Co. v. State of Georgia,* 234 U. S. 280, 34 Sup. Ct. 829, 58 L. Ed. 1312.' "

In *Des Arc Oil Mill v. Western Union Tel. Co.,* 132 Ark. 335, 201 S. W. 273, it is said:

"It was clearly the intention of Congress in enacting this statute to confer authority on the commission merely to regulate rates and classification of messages, and not to confer authority to declare the principles of law affecting the liability of a carrier for its wrongful acts or omission. *Western Union Tel. Co. v. Bailey, supra.* The classification of repeated and unrepeated messages and the fixing of rates for the different classes of messages is quite a different thing from a contract absolving the carrier from liability for its own negligence. If it had been intended to confer power upon the Interstate Commerce Commission to change the law in that respect by the mere approval of classification of rates, doubtless the framers of the statute would have used different language.

.  .  .

"The stipulation with respect to the telegraph message can not be sustained as a stipulation for value because in the very nature of the case a telegram or the damages which may flow from its breach can not be estimated in advance. *Western Union Tel. Co. v. Compton, supra.* Nor can adherence to the common law principle which invalidated such a stipulation be viewed as a burden upon or interference with interstate commerce, or as being in conflict with the authority of the Interstate Commerce Commission over that subject, for, as before stated, the exemption does not come within the scope of the regulation of rates or of classification of messages, but is purely an attempt to

contract against the general law of the land with respect to liability for negligence."

Indeed, there seems to be no other logical conclusion to be reached, and it is useless to quote from other courts or multiply authorities for what seems to be obvious. The judgment of the trial court was right and should be affirmed.

HOLCOMB, C. J., concurs with TOLMAN, J.

## ON PETITION FOR REHEARING.
### [En Banc. January 19, 1920.]

PER CURIAM.—Since the decision of this case, a petition for rehearing has been filed supported by an *amicus curiae* brief, in which the question decided is again elaborately argued.

Since the opinion in this case was filed, the United States supreme court, on December 8, 1919, in the case of *Postal Telegraph-Cable Co. v. Warren-Godwin Lumber Co.*, 247 U. S. 510, decided the same question, and the holding in that case sustains the view expressed in the majority opinion in this case. The question being the construction of the interstate commerce act as it relates to telegraph companies is primarily a Federal question, and the holding of the Federal supreme court is controlling. It does not appear, therefore, that a further argument and consideration of the question would be useful.

The petition for rehearing will be denied.